IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DORIS DEKOVEN, individually and on behalf of all others similarly situated,  )<br>)<br>Plaintiffs,  )<br>)<br>v.  )<br>)<br>PLAZA ASSOCIATES, a New York company,  )<br>)<br>Defendant.  ) | No. 05 CV 3462<br><br>HONORABLE DAVID H. COAR |

## MEMORANDUM OPINION AND ORDER

Class representative Doris DeKoven ("Plaintiff" or "DeKoven"), individually and on behalf of all other similarly situated, brings this action against Defendant Plaza Associates ("Defendant" or "Plaza Associates") alleging a violation of Section 1692(e) of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* At issue are letters sent by Defendant to the plaintiff class, attempting to collect on delinquent debts allegedly owed to third parties. Both parties now move pursuant to Fed. R. Civ. P. 56 for summary judgment. Additionally, Defendant has filed a motion, pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786 (1993), to bar Plaintiff's expert Howard Gordon.

## STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

1

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 252; *see also Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).

## FACTS

The following facts are undisputed unless otherwise noted. Plaintiff Doris DeKoven is an Illinois resident from whom Defendant Plaza Associates attempted to collect a delinquent consumer debt allegedly owed to Card Management Services Spiegel's ("Spiegel's"). Pl.'s Local Rule 56.1 Statement of Material Facts ("Pl.'s SOF") ¶ 1. Defendant Plaza Associates is a New York company that acts as a debt collector as defined by § 1692(a) of the FDCPA. *Id.* at ¶ 2. Defendant sent Plaintiff two form collection letters, dated October 7, 2004 and October 8, 2004. Both letters stated in pertinent part:

> A SETTLEMENT OFFER
>
> Please be advised that we are a professional collection agency.
>
> We have been authorized to offer you the opportunity to settle this account with a lump sum payment for 65 % of the above balance due, which is equal to $2,459.22.
>
> This offer will be valid for a period of thirty-five (35) days from the date of this letter.

*Id.* at 5, Ex. B. DeKoven testified at her May 15, 2008 deposition that she interpreted Plaza's settlement offer as an ultimatum—that she would have to take the settlement or else. *Id.* at 14.

2

The collection agreement between Defendant and Spiegel's gave Defendant blanket authority to compromise or settle the amount owed on a debt at any time for 60% of the balance. *Id.* at 8. Defendant's account history for DeKoven shows that, in addition to settlement offers for 65% of the balance in the form collection letter at issue, Defendant subsequently sent DeKoven at least two additional form collection letters, on January 22, 2005 and March 5, 2005, offering to settle her account for 50% of the total balance. *Id.* at 10, Ex. F at 3.

This Court granted Defendant's motion to dismiss on September 29, 2006. On December 21, 2007, the Seventh Circuit remanded the case for reconsideration in light of *Evory v. RJM Acquisitions Funding, L.L.C.*, 505 F.3d 769 (7th Cir. 2007).

**ANALYSIS**

The parties agree that only issue of fact here is whether the language of the two settlement offer letters contained any false, deceptive or misleading statements. Title 15 U.S.C. §1692e prohibits debt collectors from using any false, deceptive or misleading representations or means in connection with the collection of any debt. The FDCPA specifically prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. §1692e(10).

In determining whether a debt collector's practices have violated the FDCPA, courts apply the standard of the "unsophisticated debtor." *Pettit v. Retrieval Masters Creditor Bureau, Inc.*, 211 F.3d 1057, 1060 (7th Cir. 2002). The unsophisticated debtor "possesses rudimentary knowledge about the financial world, is wise enough to read collection notices with added care, possesses 'reasonable intelligence,' and is capable of making basic logical deductions and inferences." *Id.* The unsophisticated debtor standard is an objective standard; thus "unrealistic, peculiar, bizarre and idiosyncratic interpretations of collection letters" and the interpretation of

3

the "least sophisticated debtor" are to be rejected.  *Id.*  "The standpoint is not that of the *least* intelligent consumer in this nation of 300 million people, but that of the average consumer in the lowest quartile (or some other substantial bottom fraction) of consumer competence."  *Evory*, 505 F.3d at 774 (citations omitted).

If a plaintiff offers no evidence except the text of the communication, and then if there was nothing deceptive-seeming about the communication, the court must dismiss the case as a matter of law.  *Evory*, 505 F.3d at 776-77 (quoting *Taylor v. Cavalry Investment, L.L.C.,* 365 F.3d 572, 574-75 (7th Cir. 2004) ("[I]f it is apparent from a reading of the letter that not even 'a significant fraction of the population' would be misled by it . . . , the court should reject it without requiring evidence beyond the letter itself."); *McMillan v. Collection Professionals, Inc.,* 455 F.3d 754, 760 (7th Cir. 2006) ("[U]ndoubtedly, there will be occasions when a district court will be required to hold that no reasonable person, however unsophisticated, could construe the wording of the communication in a manner that will violate the statutory provision.")).  However, unlike other circuit courts, the Seventh Circuit has held that whether a representation is false, deceptive, or misleading under Section 1692e cannot always be determined as a matter of law.  In *Evory*, the Seventh Circuit held that factual evidence—including survey evidence that comports with the principles of professional survey research—could be used to determine whether a sufficiently large segment of the unsophisticated are likely to be deceived such that a factfinder could conclude that the statute has been violated.  505 F.3d at 776.

### I. Letters as facially false

Plaintiff argues that there are two ways that Defendant's letters violate § 1692e.  First, Plaintiff contends that the letters were false on their face and should be declared a violation of Section 1692e as a matter of law.  Plaintiff argues that the letters were facially false because

4

Defendant was authorized to settle for 60% of the balance of the debt at any time (not 65% of the balance within 35 days of the date of the letter, as the letters suggested). For this argument, Plaintiff relies on the analogy between the letter sent to DeKoven and the letter sent to the plaintiff in *Goswami v. American Collections Enterprise, Inc.*, 377 F.3d 488 (5th Cir. 2004), in which the Fifth Circuit found a debt collection letter stating that the defendant collection agency had been authorized to settle for 70% of the debt "only during the next thirty days" to violate § 1692e. Plaintiff argues that "[l]ike the debt collector in Goswami, Defendant Plaza was authorized to give a great discount, which discount [sic] was always available, not just during the time period set forth in the letter." Pl.'s Mem. in Supp. of Summ. J. 5-6. However, the letter in *Goswami* stated that the offer was good "*only* during the next thirty days," whereas the letter at issue in this case contains no such temporal restriction in its statement that "[t]his offer will be valid for a period of thirty-five (35) days from the date of this letter." Read literally, the letter only communicates that *this offer* will expire in 35 days, not that there will be no future offers or that the debt cannot be settled for a reduced amount at some point after 35 days. Similarly, the statement that "[Defendant has] been authorized to offer you the opportunity to settle this account with a lump sum payment for 65 % of the above balance due" is not false on its face even if Defendant was authorized to settle for an even smaller percentage of the debt; authority to settle at a certain minimum percentage includes the authority to settle for an amount *above* the absolute minimum. Plaintiff's first argument, therefore, fails to persuade this court.

## II.    Letters as misleading or deceptive

Plaintiff's second argument warrants a closer look. Plaintiff argues that even if the letters are not false on their face, they are misleading or deceptive because they lead unsophisticated consumers to believe that the 35-day offer is their last chance to get a discount off the amount

owed. Following the *Evory* court's suggestion, Plaintiff has submitted survey evidence compiled by an advertising and market opinion research expert purporting to show that a significant fraction of consumers would be mislead or deceived in this way by the language of the letter. In response, Defendant has filed a motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786 (1993), to bar Plaintiff's expert Howard Gordon and the survey evidence that he has compiled. The outcome of the parties' motions for summary judgment therefore depend on whether this Court accepts the evidence proffered by Gordon. *Evory*, 505 F.3d at 776-77 (if the communication was not false on its face, plaintiff must offer evidence that a sufficiently large segment of unsophisticated consumers are likely to be deceived or the court will dismiss the case as a matter of law).

### a. Defendant's *Daubert* motion

Under the *Daubert* framework, the court must determine whether (1) the proposed witness would testify to valid scientific, technical, or other specialized knowledge and (2) his testimony will assist the trier of fact. *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004). The first prong of this test requires the court to determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable. *Daubert*, 509 U.S. at 592. This calls upon the trial court to assess whether the proffered testimony is both relevant and reliable. *Id.*

In assessing the methodology used, courts consider: (1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence. *Cummins v. Lyle Industries*, 93 F.3d 362, 367 (7th

6

Cir. 1996). However, the Seventh Circuit has noted that "the particular factors identified in *Daubert* may not always be pertinent in assessing the reliability of expert testimony" and stressed that "the *Daubert* inquiry is a flexible one, and that an expert's testimony need not satisfy each of the above factors to be admissible. . . ." *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005) (citing *Daubert* at 593-94).

Plaintiff's witness, Dr. Howard Gordon, is the principal and director of a consumer research and market opinion research firm of which he has been a member since 1976. Pl.'s SOF Ex. G (Gordon Aff. ¶ 1). At the firm, Gordon directs the survey research practice, which includes evaluations of communications effectiveness. *Id.* at ¶ 3. Between 1963 and 1976, and again between 1981 and 1987, Gordon taught courses at Northwestern University in marketing metrics, survey research design, technique, and applications, consumer behavior, and marketing management. *Id.* at ¶ 3. Gordon designed the two-part survey for this case in order to measure how interviewees perceive and interpret the settlement offer in the debt collection letter and to learn what they think would happen if they did not accept the settlement offer. *Id.* at ¶ 11-12. In June and July 2008, interviews for the treatment sample and the control group were conducted using mall-intercept survey methodology at Orland Square Mall in Orland Park, Illinois, in the southwest suburban Chicago area. *Id.* at ¶ 16. Both the treatment sample and the control group consisted of personal face-to-face interviews with 80 consumers, 40 of whom had completed high school or less and 40 of whom had at least completed some college. *Id.* at ¶ 19. The treatment respondents were given a copy of Defendant's letter with identifying information removed; the control group was given a copy of the letter with modified settlement language, discussed further below. *Id.* at ¶ 23. Respondents were left alone to read the letters, and then interviewers returned to ask the respondents a series of questions. *Id.* at ¶ 23-24.

Defendant argues that Gordon's report is scientifically unreliable and consists of irrelevant opinions, and should therefore be stricken. Defendant points to several specific flaws in the survey methodology. First, Defendant argues that Question 7 is improper because it asks respondents how they "feel." Question 7 asks:

> In your opinion, what do you think would happen if you did not accept this settlement offer? Do you think the bill collector would renew or extend this offer? Or do you think this would be your last chance to get a discount off the amount owed? Which of these comes closes to your opinion?

Pl.'s SOF Ex. G, Attach. 2 at 21. In *Evory*, the Seventh Circuit found a similar question improper. There, respondents were asked, "Let's say the person getting this letter does not accept the settlement offer by the deadline date. Do you think that person would feel it is a limited-time offer, or is it not a limited-time offer?" The Seventh Circuit found this to be improper because "respondents [should not] have been asked what they thought some *other* recipient of the letter would 'feel,' especially since they were given no information about the hypothetical recipient." 505 F.3d at 778. Instead, the Seventh Circuit suggested that the respondents should simply have been asked

> What do you think would happen if you didn't accept the offer? Do you think it would be renewed or extended? Or do you think this would be your last chance to get a discount off the amount owed?

*Id.* Question 7 is more like the Seventh Circuit's suggested language rather than the language that was deemed improper in *Evory*. While the phrase "in your opinion, what do you think . . . ?" is inartful and redundant, it nonetheless asks the respondent to state his own perceptions of the consequences of the offer, rather than speculate about the perceptions of an unknown, hypothetical third party. Problems of Cartesian epistemology inhere in the latter but not the former formulation. Gordon could have asked this question better without the extra verbiage, but it is not fatal to the evidentiary value of the survey.

8

Second, Defendant argues that Gordon's failure to include an oral "don't know/not sure" option for the questions in his survey renders it unreliable and irrelevant. The survey interviewers were instructed to read each survey question and the possible answers to the respondents. Pl.'s SOF Ex. G, Attach. 2 at 16. For example, for Question 1, interviewers read the question ("Is the letter about trying to collect money, or is it not about trying to collect money?") and then read the possible responses ("Letter is about trying to collect money" and "Letter is not about trying to collect money"). *Id.* at 18, 25. In addition to the verbal recitation of the question and possible answers,

> [a]s each closed-end question was asked, the interviewer handed a printed card to the respondent visualizing the options and reflecting the order in which the options were presented verbally. The visual cards were used to aid interviewees in responding and eliminate any need to memorize the options. Each card gave interviewees the opportunity to say "don't know" or "not sure" if they could not offer an opinion.

*Id.* at 14. Defendant cites to the Federal Judicial Center's *Reference Manual on Scientific Evidence*, 2d Ed. (2000) explanation of the importance of including "no opinion" or "don't know" options in surveys. Def.'s Daubert Motion 5. However, Defendant does not contend that the survey did not give respondents the option of answering "don't know/not sure"; rather, the problem is that the survey interviewers did not *orally* list the "don't know/not sure" answer option even though it was an option on the printed list of possible answers that respondents were handed. Respondents still had the option of choosing "don't know/not sure"; the option was listed clearly, in large boldface type, on each of the cards that respondents were handed after a closed-ended question was asked. Defendant's arguments are only applicable to surveys in which the "no opinion" or "don't know/not sure" was not presented at all. Accordingly, this does not cause the survey to be unreliable under the *Daubert* standard.

Third, Defendant argues there are flaws with the control group that Gordon used. The language in the control group letter stated:

> We have been authorized to offer you the opportunity to settle this account with a lump sum payment for 50% of the above balance due, which is equal to $479.09.

Pl.'s SOF Ex. G-4. The only difference between the control group letter and the treatment sample letter is that the latter included this line immediately following the above sentence: "This offer will be valid for a period of thirty-five (35) days from the date of this letter." *Id.* at Ex. G-3. Defendant argues that instead of merely omitting this sentence, the control group letter should have also added the safe harbor language that the Seventh Circuit suggested would be sufficient to protect the unsophisticated consumer from receiving a false impression about his settlement options: "We are not obligated to renew your offer." *Evory*, 505 F.3d at 776. The Seventh Circuit offered this safe harbor language as a way of protecting consumers without completely disclosing the creditors' negotiating position, since doing so might cause the settlement process to disintegrate and might have wider repercussions on the credit market. *Id.*

Plaintiff replies that "[t]here is no indication that the Seventh Circuit conducted any sort of consumer survey to determine whether its proposed language would, in fact, protect the unsophisticated consumer against 'receiving a false impression of his options.'" Pl.'s *Daubert* Response at 11 (quoting *Evory*, 505 F.3d at 776. The Court disagrees; no such survey is necessary. The unsophisticated consumer is unsophisticated but he is not an utter imbecile. He "possesses rudimentary knowledge about the financial world, is wise enough to read collection notices with added care, possesses 'reasonable intelligence,' and is capable of making basic logical deductions and inferences." *Pettit*, 211 F.3d at 1060. As a matter of law, such a consumer reading the sentence "We are not obligated to renew your offer" could not come away with the mistaken impression that Defendant has only been authorized to settle during a fixed

10

period of time. Therefore, the safe harbor language provides an outer boundary for the kind of language that protects creditor interests as much as possible without becoming misleading or deceptive. This should have been the language used in the control group letter.

To give a concrete example of what this means, consider Question 7, quoted above. In the treatment sample, 58.8% of respondents believed Defendant's letter stated the "last chance to get a discount off the amount owed." In the control group, only 23.8% of respondents believed the letter without the "this offer will be valid for a period of thirty-five days" language stated the last chance to get a discount off the amount owed. While the thirty-plus point difference between the control group and treatment sample's responses might appear large, it is not legally significant for the following reason: suppose a second control group had been given a settlement letter with the "We are not obligated to renew your offer" language. It is possible that 58.8% of this second control group would also have believed that the letter stated the last chance to get a discount off the amount owed. In this case, the survey cannot be used as evidence that the "this offer is valid for a period of thirty-five days" language is misleading because it is not any *more* misleading than what the Seventh Circuit has determined to be objectively not misleading, regardless of what this particular survey might suggest. Thus, the safe harbor language is the best point of comparison for the deceptiveness of Defendant's letter, and it should have been used in the control group letter. Because it was not, the Court cannot find the survey to be legally significant.[1]

This is an unfortunate outcome. Similar flaws in survey design have led several other courts in this circuit to reject Dr. Gordon's FDCPA-related surveys. *See, e.g.*, *Jackson v.*

---

[1] Since the Court finds that this control group problem is enough reason to bar Dr. Gordon's survey, it need not consider Defendant's other arguments for the unreliability of his survey methodology.

*Midland Credit*, No. 04 C 5056 (N.D. Ill. Aug. 18, 2006) (holding that the survey failed to ask the correct question); *Hernandez v. Attention LLC*, No. 04 C 3834 at 7 (N.D. Ill. Sept. 28, 2005) ("The survey's fatal flaw is that it did not make use of a control group."); *Jackson v. National Action Fin. Servs.*, 441 F.Supp.2d 877 (holding the survey unreliable because of the wording of the questions). Each successive survey is slightly closer to being factual evidence that could be used to determine whether a sufficiently large segment of the unsophisticated are likely to be deceived, but each survey has thus far failed. The confounding state of jurisprudence on the FDCPA in this circuit avoids the problem of federal judges deciding an issue they are not best equipped to decide (whether unsophisticated consumers would be deceived by a particular debt collection statement) by asking them instead to determine yet another issue they are not best equipped to decide (whether a consumer survey comports with reliable scientific methodology). *See Evory*, 505 F.3d at 776 ("The intended recipients of dunning letters are not federal judges, and judges are not experts in the knowledge and understanding of unsophisticated consumers facing demands by debt collectors."); *Daubert*, 509 U.S. at 600-01 ("I do not doubt that [Fed. R. Evid.] 702 confides to the judge some gatekeeping responsibility in deciding questions of the admissibility of proffered expert testimony. But I do not think it imposes on them either the obligation or the authority to become amateur scientists in order to perform that role.") (Rehnquist, J., dissenting). Unfortunately, until debtors challenging dunning letters as misleading or deceptive produce survey evidence that comports with the principles of professional survey research, better-equipped factfinders—i.e., juries—will not have the chance to judge the deceptiveness of these letters.

## CONCLUSION

For the foregoing reasons, Defendant's *Daubert* motion and Defendant's motion for summary judgment are GRANTED. Plaintiff's motion for summary judgment is DENIED.

Enter:

/s/ David H. Coar  
David H. Coar  
United States District Judge

**Dated:** March 31, 2009